# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

SILVERGATE PHARMACEUTICALS, INC.,

          Plaintiff,

    v.

BIONPHARMA INC.,

          Defendant.

C.A. No. 1:16-CV-00876-MSG
(consolidated)

## <u>DECLARATION OF DAVID ANDERSON, PH.D.</u>

I, David Anderson, Ph.D., declare under penalty of perjury the following:

## I.      BACKGROUND AND QUALIFICATIONS.

1.      I am the co-founder of TexDel, Inc., and have been its principal scientist since 2012.  TexDel, Inc. is a company focused on novel drug delivery technologies, including dermal, local, and transdermal delivery through articles of clothing and linens.  My work specifically focuses on production methodology, production-scale development, troubleshooting, and QA/QC.  While at TexDel, I have developed a patented drug-delivery system based on articles of clothing made from yarn infused with cosmeceutical or pharmaceutical actives, a technology that has garnered strong attention and funding.

2.      Before co-founding TexDel, Inc., I was a co-founder of Lyotropic Therapeutics, Inc., and was its principal scientist from 1999 through 2011.  At Lyotropic Therapeutics, I lead technical R&D from formulation conception and was responsible for the innovation of a continuous stream of drug delivery vehicles, and processes for products with difficultly-soluble APIs, for injectable and ophthalmic routes, and drug-device combinations.  As part of my work, I devised formulations as dispersions, solutions and lyophilized dosage forms incorporating

colloidal liquid crystal solubilization technology, and peptide/protein-stabilizing formulations inhibiting degradative deamidation.  I further developed and comparison-tested formulations based on such materials as lipid nanoparticles, nanocrystals, emulsions, liposomes, cyclodextrins, micelles, microemulsions, cubosomes, polymer encapsulation, lyophilized powders, and resorbable hydrogels.

3.      During my time at Lyotropic Therapeutics, the FDA approved a life-saving, injectable drug formulation (Ryanodex®) of my invention, which was subsequently successfully marketed.  I was largely responsible for the development of this drug product due to the unusual nanocrystal product format.  Nearly every data point in the pre-clinical development of Ryanodex was primarily my responsibility.  While at Lyotropic Therapeutics, I also developed a substantial patent portfolio which was sold to a contract formulation company, Particle Sciences, Inc.  These patents can be seen to cover a very wide range of formulation types.

4.      Prior to co-founding Lyotropic Therapeutics, I was the principal scientist at SelectRelease LLC, where my responsibilities included all hands-on experimental work and oversight of research and development activities and analysis.  At SelectRelease, I developed surfactant- and lipid-based formulations for personal care/cleaning, nutritional/nutriceutical, cosmetic/cosmeceutical, OTC pharmaceutical, and food/beverage products.

5.      I earned my Masters of Science in mathematics from the University of Minnesota.  I earned my Ph.D. in chemical engineering, also from the University of Minnesota.  I have been trained by some of the best mentors in the world, notably H. Ted Davis and Håkan Wennerström.  Before entering the private sector, I was an Assistant Professor in the Biomaterials department at the University of Buffalo, where I lead a research group focused on the formation of nanoporous materials through the polymerization of lyotropic (lipid-based) liquid crystals, with subsequent

post-processing including electroplating at the nanostructured level.

6.     My expertise is grounded in physical chemistry, which connects very intimately with pharmaceutical formulations.  I am knowledgeable about organic chemistry and adept at studying reactions such as hydrolysis and oxidation that are crucial in API stability, and I have frequently needed to apply knowledge of organic reactions in my formulations work.  I have deep knowledge in solutions/solvation, self-association, thermodynamics, colloids, phase transformations, dispersion forces, surface energies, and all sorts of unusual behaviors that occur at interfaces between, viz., pharmaceutical ingredients.  I have used a great many analytical techniques as cited in my CV, and my physical chemistry expertise often affords me additional important insights into understanding and interpreting analytical data.

7.     I am an author on numerous scientific publications, and I am an inventor on 14 issued U.S. patents.

8.     Further details regarding my education, employment history, and experience are set forth in my Curriculum Vitae, attached hereto as Exhibit A.

9.     Prior to this case, I have acted as an expert witness in at least 2 different matters, identified in Exhibit A hereto.

## II.     NATURE OF ASSIGNMENT AND SUMMARY OF OPINIONS.

10.     I have been asked by counsel for Defendant Bionpharma Inc. ("Bionpharma") in the above-captioned case to review and analyze U.S. Patent Nos. 8,568,747 B2 ("'747 patent") and 8,778,366 B2 ("'366 patent") (together, the "patents-in-suit"), to provide a background of the technology at issue in the '747 and '366 patents, and to explain how certain terms of the '747 and '366 patents would be interpreted by the person of ordinary skill in the art as of the filing date of the patent-in-suit in view of the claim language, specification, and prosecution history.

11.     In addition to the patents-in-suit and their prosecution histories, and various references I discuss herein, I have also reviewed Plaintiff Silvergate Pharmaceuticals, Inc.'s ("Silvergate") Opening Claim Construction Brief (D.I. 60).

12.     I understand that the disputed terms proposed for court construction, and the parties' initial proposed constructions, are as follows:

| Claim Term/Phrase for Construction | Silvergate's proposed construction | Bionpharma's proposed construction |
|---|---|---|
| mannitol | mannitol or sugars that perform substantially the same function in substantially the same way to yield substantially the same result | (2R,3R,4R,5R)-hexane-1,2,3,4,5,6-hexol |
| about | approximately | including the standard level of error for the device or method being employed |
| about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof | approximately 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof, wherein enalapril refers to enalapril base, its salt, or solvate or derivative or isomer or polymorph thereof | 13.86% to 14.14% (w/w) enalapril or a pharmaceutically acceptable salt thereof as determined by HPLC analysis, or any other scientifically acceptable method of equal or greater precision |
| about 85% (w/w) mannitol | approximately 85% (w/w) mannitol, wherein mannitol refers to mannitol or sugars that performs substantially the same function in substantially the same way to yield substantially the same result | 82.45% to 87.55% (w/w) mannitol as determined by HPLC analysis, or any other scientifically acceptable method of equal or greater precision |
| about 1% colloidal silicon dioxide | approximately 1% colloidal silicon dioxide | 0.95% to 1.05% (w/w) colloidal silicon dioxide as determined by gravimetric analysis, or any other scientifically acceptable method of equal or greater precision |
| "relative humidity" | does not require construction, plain and ordinary meaning, as understood by a person of ordinary skill in the art in view of the intrinsic record | the amount of atmospheric moisture present relative to the amount that would be present if the air were saturated |

13.     For the reasons expressed below, I agree with Bionpharma's proposed construction of the terms:

- mannitol;

- "about";

- "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof";

- "about 85% (w/w) mannitol"; and

- "about 1% colloidal silicon dioxide."

## III.   BACKGROUND.

14.    Most pharmaceutical drugs are active drug substances (or "active pharmaceutical ingredients") that have been formulated, or put into, dosage forms, such as tablets, capsules, powders, liquids, or suspensions, for administration to patients.

15.    A pharmaceutical formulation is a combination of the active pharmaceutical ingredient plus inactive ingredients (excipients) that together form a pharmaceutical composition.

16.    Pharmaceutical drug formulators are tasked with formulating active pharmaceutical ingredients into pharmaceutical compositions which may be administered to patients.  When a formulator is tasked with making a pharmaceutical composition, he or she has several different options regarding the type of delivery system and dosage form of the composition.  A number of considerations influence what type of delivery system or dosage form a pharamceutical formulator will pursue for a drug, including release and absorption, stability, properties of the active pharamceutical ingredient, cost, ease of administration, patient compliance, etc.

## IV.   THE PATENTS-IN-SUIT.

17.    The '747 patent issued on October 29, 2013, from U.S. Patent Application No. 13/670,355 ("'355 application"), which was filed on November 6, 2012, and which claims

5

priority to U.S. Provisional Patent Application No. 61/710, 489 ("'489 application"), filed on October 5, 2012.  D.I. 61, Ex. 1, '747 patent at cover.  The '747 patent is generally directed to enalapril compositions containing mannitol and methods of using those compositions to treat hypertension and heart failure.  *See, generally*, D.I. 61, Ex. 1, '747 patent.  Enalapril is an antihypertensive drug falling under the class of angiotensin-converting enzyme (ACE) inhibitors.  D.I. 61, Ex. 1, '747 patent, col. 1, ll. 27-41.  As explained in the specification, the '747 patent is directed to stable powder and liquid formulations of enalapril and mannitol that are allegedly advantageous over conventional solid oral dosage forms of enalapril.  The specification of the '747 patent explains that the disclosed enalapril/mannitol powders were more stable than powder blends of enalapril/lactose and enalapril/sucrose, and makes similar assertions for solutions reconstituted from those powder blends.  D.I. 61, Ex. 1, '747 patent, col. 6, ll. 17-22; *id.* at col. 21, l. 20-col. 22, l. 51.

18.     As explained below, the claims of the '747 patent are more narrowly directed to pharmaceutical powders consisting of enalapril, mannitol, and colloidal silicon dioxide, in certain specified amounts, wherein, upon reconstitution into an oral liquid, the liquid is homogenous and stable under certain conditions.  D.I. 61, Ex. 1, '747 Patent at claims 1-6.

19.     The '366 patent issued on July 15, 2014 from U.S. Patent Application No. 13/914,452 ("'452 application"), filed on June 10, 2013 as a continuation of the '355 application, and claims priority to the '489 application.  D.I. 61, Ex. 2, '366 patent at cover.  The '366 patent is a continuation of the '747 patent and shares its specification.  *See, generally*, D.I. 61, Ex. 2, '366 patent.  The claims of the '366 patent are narrowly directed to using pharmaceutical powder compositions of enalapril, mannitol, and colloidal silicon dioxide, in certain amounts, reconstituted as liquid formulations that are stable under certain conditions, for the treatment of

6

hypertension, prehypertension, heart failure, and left ventricular dysfunction.  D.I. 61, Ex. 2, '366 patent at claims 1-15.

## V.     THE ASSERTED PATENT CLAIMS.

20.     I understand that Silvergate has asserted independent claim 1, and dependent claims 2, 4, and 5 of the '747 patent against Bionpharma.  Claim 1, with certain disputed claim terms in bold, are set forth below:

> 1. A pharmaceutical powder that is reconstituted into an oral liquid formulation, the powder consisting of:
> (a) **about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof**,
> (b) **about 85% (w/w) mannitol**, and
> (c) **about 1% (w/w) colloidal silicon dioxide**,
>
> wherein, when the powder is reconstituted into an oral liquid, the liquid is homogenous and stable for at least 12 weeks at about 25±5° C. and 55±10% **relative humidity**.

21.     I understand that Silvergate has asserted independent claims 14 and 15 of the '366 patent against Bionpharma.  Claims 14 and 15, with the remaining disputed claim terms in bold, are set forth below:

> 14. A method of treating heart failure in a subject in need comprising administering to that subject a therapeutically effective amount of a pharmaceutical powder that is reconstituted into an oral liquid formulation, the powder consisting of: (a) **about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof**, (b) **about 85% (w/w) mannitol**, and (c) **about 1% (w/w) colloidal silicon dioxide**, wherein, when the powder is reconstituted into an oral liquid, the liquid is homogenous and stable for at least 12 weeks at about 25±5° C. and 60±10% **relative humidity**.

> 15. A method of treating left ventricular dysfunction in a subject in need comprising administering to that subject a therapeutically effective amount of a pharmaceutical powder that is reconstituted into an oral liquid formulation, the powder consisting of: (a) **about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof**, (b) **about 85% (w/w) mannitol**, and (c) **about 1% (w/w) colloidal silicon dioxide**, wherein, when the powder is reconstituted into an oral liquid, the liquid is homogenous and stable for at least 12 weeks at about 25±5° C. and **relative humidity**.

## VI.    THE PERSON OF ORDINARY SKILL IN THE ART.

22.     It is my opinion that the person of ordinary skill in the art to which the patents-in-suit pertain would have had a high level of education, such as having at least a master's degree, but more likely a Ph.D. with a specialty or focus in formulation science, or a Ph.D. in organic chemistry, medicinal chemistry, physical chemistry, pharmacology, or a related discipline, and several years of experience in the development of pharmaceutical formulations. The person (or team) of ordinary skill in the art could have had a lower level of formal education if such a person had a higher degree of experience.   Further, pharmaceutical drug development is a collaborative endeavor, where artisans often rely on others in related fields, such as synthetic chemistry, organic chemistry, analytical chemistry, biochemistry, biology, toxicology, pharmacology, medicine, and the like.   Thus, a person of ordinary skill in the art would have access to such experts in related fields.

## VII.   CLAIM CONSTRUCTION.

### A.    Legal Standards.

23.     I have been instructed by Bionpharma's attorneys that patent claims define the invention to which the patentee is entitled the right to exclude, and they must be definite in that they particularly point out and distinctly claim the invention.

24.     I have also been advised that words in a claim are generally given their ordinary and customary meaning to one of ordinary skill at the time of the alleged invention in view of the claim language itself, other claims, the specification, and prosecution history of the patent. Specifically, I understand that claim terms must be interpreted in light of such intrinsic evidence because the person of ordinary skill in the art would read the claim term in the context of such evidence.

25.    I understand that the patent specification is highly relevant to the claim construction analysis, and is usually dispositive when the proposed construction most naturally aligns with the patent's description of the invention.  However, I understand that while a claim term must be interpreted in light of the specification, limitations from the specification may not be imported into the claims.

26.    I have also been advised that the prosecution history can inform the meaning  of the claim language, and that clear and unmistakable statements during prosecution may disavow claim scope.

27.    I have also been advised that a patentee can be his own lexicographer and may assign a claim term a meaning other than its ordinary and accustomed meaning.

28.    I have also been advised that courts are also authorized to rely on extrinsic evidence, such as expert testimony, dictionaries, and learned treatises, during claim construction, and that expert testimony may be useful to a court for a variety of purposes, such as providing background on the technology at issue, to explain how the claimed invention works, to ensure that the court's understanding of the technical aspects of the patent align with that of a person of ordinary skill, or to establish that a particular term in the patent has a particular meaning to skilled artisans in the relevant field.

29.    I have also been advised that the specification of a patent must describe the claimed invention sufficient to allow a person of ordinary skill in the art to make and use the claim invention, and that the description must be sufficient to provide the person of ordinary skill in the art an assurance that the inventor was in possession of what is claimed at the time the patent was filed.  I have also been advised that a patent claim cannot enlarge what is patented beyond what the inventor has described as the invention in the specification.

30.     I have applied the foregoing legal standards in my evaluation of disputed claim terms and now provide the following opinions.

**B.     "mannitol"**

| Claim Term/Phrase for Construction | Silvergate's proposed construction | Bionpharma's proposed construction |
|---|---|---|
| "mannitol" | Does not require construction, plain and ordinary meaning

Alternatively, mannitol or sugars that perform substantially the same function in substantially the same way to yield substantially the same result | (2R,3R,4R,5R)-hexane-1,2,3,4,5,6-hexol |

31.     The term "mannitol" appears in independent claim 1 of the '747 patent, and in independent claims 14 and 15 of the '366 patent.  Mannitol likewise appears through the specifications of the patents-in-suit, including in all exemplary formulations.

32.     Mannitol is a widely understood chemical name, referring to the compound (2R,3R,4R,5R)-hexane-1,2,3,4,5,6-hexol, pictured below:



33.     Chemical nomenclature is a universally accepted set of rules in the fields of chemistry and the related arts, the primary function of which is to ensure that a spoken or written chemical name leaves no ambiguity concerning which chemical compound the name refers to.

34.     Indeed, IUPAC (International Union of Pure and Applied Chemistry) has stated that "[t]he main purpose of chemical nomenclature is to identify a chemical species by means of written or spoken words."  Ex. B, IUPAC, Commission on Nomenclature of Organic Chemistry,

*A Guide to IUPAC Nomenclature of Organic Compounds (Recommendations 1993)*, at Preamble (Blackwell Scientific publications 1993).

35.     The IUPAC nomenclature for a chemical provides sufficient detail for the reader or listener to understand the chemical's physical structure, and as a result, is typically very long and unwieldy.

36.     As a result, many widely-used compounds are referred to in the ordinary course of business or research by "common" names, eschewing the lengthy and burdensome IUPAC nomenclature.  Specifically, regarding these traditional names, IUPAC has stated: "[t]hey are useful, and in many cases indispensable (consider the alternative systematic name for cholesterol, for example).  Little is to be gained, and certainly much to be lost, by replacing such names.  Therefore, where they meet the requirements of utility and precision, and can be expected to continue to be widely used by chemists and others, they are retained and, for the most part, preferred by this guide."  Ex. B, IUPAC, Commission on Nomenclature of Organic Chemistry, *A Guide to IUPAC Nomenclature of Organic Compounds (Recommendations 1993)*, at Preamble (Blackwell Scientific publications 1993).

37.     Examples of such common names are:

- toluene instead of "methylbenzene" or "phenylmethane";

- glucose instead of "(2$R$,3$S$,4$R$,5$R$)-2,3,4,5,6-Pentahydroxyhexanal";

- acetaminophen      instead      of      "$N$-(4-hydroxyphenyl)ethanamide $N$-(4-hydroxyphenyl)acetamide";

- citric acid instead of "2-hydroxypropane-1,2,3-tricarboxylic acid"; and

- cholesterol instead of "(3$S$,8$S$,9$S$,10$R$,13$R$,14$S$,17$R$)-10,13-dimethyl-17-[(2$R$)-6-methylheptan-2-yl]-2,3,4,7,8,9,11,12,14,15,16,17-dodecahydro-1$H$-

11

cyclopenta[*a*]phenanthren-3-ol."

38.    Despite these common names conveying less information expressly, they nevertheless convey such information inherently.  A person of ordinary skill in the art would understand that a chemical referred to by its common name refers to that specific chemical and no others.

39.    Such specificity is necessary in the fields of chemistry and the chemical arts for many reasons.  For example, reproducibility is one of the main principles of the scientific method, and failing to properly identify all reagents and solvents used in a particular chemical reaction would make it impossible for other scientists to replicate that same reaction.

40.    This level of required specificity is borne out in practical and real life applications as well.  In a laboratory setting, for example, a scientist would never simply note "alcohol" as a solvent, because it could be understood to refer to methanol, ethanol, isopropanol, etc.

41.    This is also true in a pharmaceutical regulatory setting.  A person of ordinary skill in the art understands that when representing to FDA the presence or absence of a chemical, that chemical needs to be identified with exacting specificity.  For example, an applicant for a New Drug Application could not recite "glucose" as an inactive ingredient, and then formulate their product using lactose.

42.    As stated above, "mannitol" is a commonly used name to refer to one specific chemical: (2R,3R,4R,5R)-hexane-1,2,3,4,5,6-hexol.  This is recognized in all major chemical compendiums, such the Pubchem directory.  *See, e.g.,* Ex. C, *D-mannitol | C6H14O6 – Pubchem.*  Therefore, I agree with Bionpharma's proposed construction of the term "mannitol" as "(2R,3R,4R,5R)-hexane-1,2,3,4,5,6-hexol."

43.    I have read Silvergate's proposed definition of "mannitol" as having its "plain and

ordinary meaning." While I agree that the term "mannitol" should carry its plain and ordinary meaning to a person of ordinary skill in the art, that "plain and ordinary" meaning to a person of ordinary skill is (2R,3R,4R,5R)-hexane-1,2,3,4,5,6-hexol. Silvergate's proposed "alternate" definition of "mannitol" is illuminating in that it shows that Silvergate is advocating a definition of "mannitol" that encompass chemical compounds beyond mannitol. As such, it is my understanding that Silvergate's alleged "plain and ordinary meaning" definition is broader than how a person of ordinary skill would understand "mannitol," and intended to define "mannitol" in a way such that it means mannitol itself or any compound that functions like mannitol.

44.    I have read Silvergate's proposed "alternate" definition of "mannitol" as "mannitol or sugars that perform substantially the same function in substantially the same way to yield substantially the same result." This proposed definition is contrary to all principles of chemistry and chemical nomenclature and not how a person of ordinary skill would understand "mannitol" as used in the patents-in-suit.

45.    First, Silvergate does not even attempt to define what mannitol actually is, as evidenced by its recitation of the term "mannitol" expressly in its proposed definition. This circular reasoning, however, demonstrates that Silvergate is at least aware of what mannitol actually is, and acknowledges that the term "mannitol" refers to one specific chemical compound.

46.    Silvergate then defines "mannitol" by appending that it also refers to "sugars that perform substantially the same function in substantially the same way to yield substantially the same result." Thus, I understand that Silvergate is proposing that a person of ordinary skill in the art would understand "mannitol" to refer to mannitol, as well as a broad class of compounds, to which the skilled artisan must perform testing to validate whether such compound "perform[s]

substantially the same function in substantially the same way to yield substantially the same result," and is therefore, literally, mannitol.  This "alternate" construction for "mannitol" does not comport with how a person of ordinary skill would understand "mannitol" as used in the asserted claims, and has no support in the specifications or prosecutions histories for the patents-in-suit.

47.     A particularly relevant example compound that reveals the imprecision in Silvergate's definition of mannitol is the compound sorbitol.  Sorbitol differs from mannitol only by the <u>orientation</u> of one carbon-oxygen bond, but the two have very different sources, digestibilities, uses, and melting points.  The higher melting point and better physiological compatibility of mannitol over sorbitol are reasons why it is used in formulations instead of sorbitol.  This provides one example where some, but not all, of the many characteristics of a compound differ from mannitol, and the differences in this case are consequential in formulations.  It is NOT a priori known whether a given compound is "similar enough" to mannitol that it will "function in substantially the same way", and therefore it is circular logic to try to use the Silvergate definition, ultimately requiring experimentation.

48.     The specifications provide no support for the assertion that mannitol can mean anything other than the singular compound that is mannitol.  All identified embodiments in the specifications require that mannitol be present, and all examples are formulations comprising mannitol; the exception being examples that pair enalapril with lactose or sucrose, which are comparative examples used to demonstrate the alleged superiority of the enalapril-mannitol combination with respect to stability.  *See* D.I. 61, Ex. 1, '747 patent, col. 21, l. 20-col. 23, l. 33. To allow "mannitol" to literally be other ingredients would necessarily make the claims broader than what the patents-in-suit describe and enable as the alleged invention.

49.     Furthermore, the patentees argued during prosecution of the patents-in-suit the importance of mannitol in the claimed inventions to overcome the prior art.  *See, e.g.*, Ex. D, '747 Patent PH at 5/1/2013 Amendment/Req. Reconsideration, at 7 ("Applicant respectfully submits that Sosnowska and Jursic would not have provided any reason to single out ***the specific components*** at the requisite concentrations for a pharmaceutical powder recited in the instant claims") (emphasis added) (SPI_0000149); *id.* ("As the Specification and Drawings of the instant application show, ***the enalapril drug alone with the mannitol*** and colloidal silicon dioxide exhibit excellent stability and uniformity properties in powder and reconstituted liquid form") (emphasis added) (SPI_0000149); *id.* at 8 ("While Sosnowska teaches enalapril oral suspensions from ground enalapril tablets, nothing in Sosnowska provides any reason or rationale of how one of ordinary skill in the art would use these teachings to arrive at pharmaceutical enalapril powders, ***let alone pharmaceutical enalapril powders with enalapril, mannitol, and colloidal silicon dioxide***") (emphasis added) (SPI_0000150); *id.* at 9 ("Sosnowska fails to disclose or suggest ***mannitol*** and colloidal silicon dioxide in compositions with enalapril") (emphasis added) (SPI_0000151); *id.* ("Contrary to the Office's assertion that '[l]actose is used interchangeably with mannitol in the pharmaceutical industry.' Applicant submits that one skilled in the art, i.e., a formulator would recognize that ***mannitol and lactose have vastly different properties*** in terms of chemical reactivity, water content, patient tolerance, etc.") (emphasis added) (SPI_0000151); *id.* at 10 ("However, Applicant respectfully points out that ***nothing in Jursic would give one of ordinary skill in the art any reason, basis, suggestion or rationale to select mannitol*** as well as a glidant, let alone colloidal silica to form an enalapril powder composition as recited in the instant claims") (emphasis added) (SPI_0000152); *id.* at 11 ("Regarding mannitol, as Applicant has noted above, Jursic teaches, in various embodiments,

enalapril/lercanidipine tablet compositions which contain either mannitol or lactose without a preference for either.") (SPI_0000153); *id.* ("As such, the prior art does not provide any expectation that any <u>particular</u> combination would be successful for stable enalapril powder compositions, ***much less any expectation that the combination of enalapril, mannitol and colloidal silicon dioxide*** would be successful in forming a stable enalapril pharmaceutical powder.  Simply put, to arrive at ***the combination of a enalapril, mannitol and colloidal silicon dioxide*** using the Jursic and Sosnowska references, one skilled in the art must 'vary all parameters or try each of the numerous possible choices' of the reference without 'direction as to which of the many choices is likely to be successful.'") (emphasis added) (SPI_0000153); *id.* at 14 ("As discussed in the interview, ***Applicant submit that each component is required for a stable pharmaceutical enalapril powder for reconstitution into an oral liquid.  With respect to mannitol, Example 1 of the instant application describes that mannitol unexpectedly stabilizes enalapril in powder form moreso than lactose***.") (emphasis added) (SPI_0000156); *id.* at 16 ("Instead, ***mannitol gave the greatest enalapril stability***.  These results are not predicted or suggested anywhere in the literature, thus showing the ***unexpected properties of mannitol*** contributing to enalapril stability") (emphasis added) (SPI_0000158); *id.* at 17 ("Accordingly, the specification and examples of the pending application show the ***unexpected properties of the [mannitol]*** and colloidal silicon dioxide for the enalapril pharmaceutical powder which rebuts any prima facie obviousness") (emphasis added) (SPI_0000159); *id.* at 8/21/2013 Amendment/Req. Reconsideration at 2-3 (cancelling dependent claims directed to inclusion of a further excipient, or to a sweetener) (SPI_0000177-78); *id.* at 4 ("Applicant has amended claim 1 such that it recites a pharmaceutical powder c***onsisting of the three components, enalapril, mannitol and colloidal silicon dioxide***") (emphasis added) (SPI_0000179); *id.* at 5 ("neither

16

Sosnowska nor Jursic teaches nor suggests, alone or in combination, a ***pharmaceutical powder consisting of enalapril, mannitol and colloidal silicon dioxide***, let alone the recited amounts of each component and further reconstituting the powder into a liquid where the liquid is homogenous and stable for at least 12 weeks at the recited conditions.") (emphasis added) (SPI_0000180); *id.* at Applicant-Initiated Interview Summary dated 8/20/2013 ("Applicants indicated that one of the distinctions of their invention lies in that the pharmaceutical powder has ***three essential components***.   Applicants intend to make claim amendments to reflect the distinction.") (emphasis added) (SPI_0000183); *id.* at Notice of Allowability at 2 ("Applicants have amended claim 1 to include the close ended preamble of 'consist of', which ***excludes other excipients*** of prior art.") (emphasis added) (SPI_0000191); Ex. E, '366 Patent PH, 11/27/2013 Amendment/Req. Reconsideration at 7 ("Specifically, Applicant respectfully submits that the RxList, Jursic and Sipahi would not have provided any reason to single out ***the specific components*** at the requisite concentrations for a pharmaceutical powder recited in the instant claims.") (emphasis added) (SPI_0000310); *id.* at 7-8 ("As the Specification and Drawings of the instant application show, ***the enalapril drug along with the mannitol*** and colloidal silicon dioxide exhibit excellent stability and uniformity properties in powder and reconstituted liquid form) (emphasis added) (SPI_0000310-11); *id.* at 8 ("RxList provides no reason or rationale of how one of ordinary skill in the art would use these teachings to arrive at pharmaceutical enalapril powders, ***let alone pharmaceutical enalapril powders with enalapril, mannitol*** and colloidal silicon dioxide.") (emphasis added) (SPI_0000311); *id.* at 9 ("In particular, Applicant submits that one skilled in the art, i.e., ***a formulator would recognize that mannitol and lactose have vastly different properties*** in terms of chemical reactivity, water content, patient tolerance, etc.") (emphasis added) (SPI_0000312); *id.* ("However, Applicant respectfully points out that

nothing in Jursic would give one ordinarily skilled in the art *any reason, basis, suggestion or rationale to select mannitol* as well as a glidant, let alone colloidal silica to form an enalapril powder composition as recited in the instant claims.") (emphasis added) (SPI_0000312); *id.* at 10 ("This further raises the question of *how one would select mannitol over lactose* as taught by RxList or Jursic.  Neither reference teaches that *mannitol is preferred over lactose*.") (emphasis added) (SPI_0000313); *id.* ("Regarding mannitol, as Applicant has noted above, Jursic teaches, in various embodiments, enalapril/lercanidipine tablet compositions which contain either mannitol or lactose without a preference for either.") (SPI_0000313); *id.* at 11 ("As such, the prior art does not provide any expectation that any particular combination would be successful for stable enalapril powder compositions, much less any expectation that the *combination of enalapril, mannitol* and colloidal silicon dioxide would be successful in forming a stable enalapril pharmaceutical powder.  Simply put, to arrive at *the combination of enalapril, mannitol* and colloidal silicon dioxide using the cited references, one skilled in the art must 'vary all parameters or try each of the numerous possible choices' of the reference without 'direction as to which of the many choices is likely to be successful.'") (emphasis added) (SPI_0000314); *id.* at 12 ("However, nothing in Sosnowska provides any reason or rationale of how one of ordinary skill in the art would use these teachings to arrive at pharmaceutical enalapril powders, *much less pharmaceutical enalapril powders with enalapril, mannitol* and colloidal silicon dioxide.") (emphasis added) (SPI_0000315); *id.* at 13 ("Second, *Sosnowska fails to disclose or suggest mannitol* and colloidal silicon dioxide in compositions with enalapril.") (emphasis added) (SPI_0000316); *id.* at 14 ("However, these references are completely silent as to the desirability of any particular combination for stable enalapril pharmaceutical powder compositions, *let alone any expectation that the combination of enalapril, mannitol* and

18

colloidal silicon dioxide would be successful in forming a stable enalapril pharmaceutical powder.") (emphasis added) (SPI_0000317); *id.* ("He or she would not have any reason to specifically focus on ***the combination of enalapril, mannitol*** and colloidal silicon dioxide) (emphasis added) (SPI_0000317); *id.* at 17 ("With respect to mannitol, Example 1 of the instant application describes that ***mannitol unexpectedly stabilizes enalapril in powder form*** moreso than lactose.") (emphasis added) (SPI_0000320); *id.* at 19 ("Instead, ***mannitol gave the greatest enalapril stability.*** These results are not predicted or suggested anywhere in the literature, thus showing the ***unexpected properties of mannitol contributing to enalapril stability***.") (emphasis added) (SPI_0000322).

50.     The singular emphasis on mannitol in both the disclosures of the patents-in-suit and the prosecution histories of the patents-in-suit further evidences that the patentee had no intention of "mannitol" being replaceable with other ingredients, let alone ***literally*** being other chemicals.

51.     Silvergate's proposed construction of "mannitol" – that it does not require construction – must be read with an eye toward the scope of the definition that Silvergate has otherwise proposed.  I do not believe that Silvergate intends for its "plain and ordinary meaning" to be limited to solely the chemical compound mannitol, or (2R,3R,4R,5R)-hexane-1,2,3,4,5,6-hexol.  Thus, I agree with Bionpharma's proposed definition of "mannitol" – (2R,3R,4R,5R)-hexane-1,2,3,4,5,6-hexol.

C.     "about"

| Claim Term/Phrase for Construction | Silvergate's proposed construction | Bionpharma's proposed construction |
|---|---|---|
| "about" | approximately | including the standard level of error for the device or method being employed |

52.    The term "about" appears in independent claim 1 of the '747 patent, and in independent claims 14 and 15 of the '366 patent.

53.    The patentees expressly defined the term "about" in the specification of the patents-in-suit.  Specifically, the patentee stated under the heading of "Certain Definitions": "Unless defined otherwise, all technical and scientific terms used herein have the same meanings as commonly understood by one of ordinary skill in the art."  D.I. 61, Ex. 1, '747 patent at col. 19, ll. 19-22.  The patentee then went on to define: "The term 'about' is used to indicate that a value includes the standard level of error for the device or method being employed to determine the value."  D.I. 61, Ex. 1, '747 patent at col. 19, ll. 33-35.

54.    The person of ordinary skill in the art would understand that the patentee acted as his own lexicographer in defining this claim term, and would understand the term to have exactly the meaning as defined, no more and no less.  I therefore agree with Bionpharma's proposed construction of the term "about."

55.    I understand that Silvergate has proposed that the term "about" be construed as "approximately."  I have further read Silvergate's Opening Claim Construction Brief, where they argue that "[t]he '747 and '366 patents' common specification includes no redefinition of the term 'about,'" and that "there is nothing in either the '747 or '366 patents' common specification or respective prosecution histories to suggest the applicant intended to deviate from the plain and ordinary meaning of 'about.'"  D.I. 60 at 10.  I also understand that Silvergate has posited that

the express definition in the patent specifications "is not a definition of the term 'about.'"  D.I. 60 at 10, n.6.  I disagree:  a person of ordinary skill in the art would not overlook an express definition in a patent specification, especially an express definition directly under the heading "Certain Definitions."

56.    I also note that Silvergate has argued that "the specification does not state that there is a range implicit in 'about' that is co-extensive with the standard level of error, but rather that the range of 'about' 'includes' such 'standard level of error.'"  D.I. 60 at 10, n.6.  This is a misreading of the express definition in the specification, and a misreading of the patent claims. The patents-in-suit state that "[t]he term 'about' is ***used to indicate that a value includes*** the standard level of error for the device or method being employed to determine the value."  D.I. 61, Ex. 1, '747 patent at col. 19, ll. 33-35.  That is, the term "about" modifies the term "value" in a particular way – by expanding this value to include a standard level of error.  There is no support for the argument that the term "about" carries with it any additional range, such range simply including the standard level of error.

57.    Silvergate's argument presumes that the claimed weight percentages themselves have some range beyond that which is granted by the patentee's inclusion of the term "about." This is not the case.  Without a term of approximation, the person of ordinary skill in the art would understand, for example, 14% to mean 14%, not some range of values presumably centered on 14%.  The inclusion of the term "about" is what broadens the scope to include a range of values.  With this in mind, the express specification definition of "about" modifies the value – not a range of values – in a specific way.  The claims therefore read, for example, "14% (w/w), including the standard level of the device or method being employed to determine this value, enalapril."

21

58.     Silvergate's proposed construction runs afoul of both what I understand the law to be, and to how a person of ordinary skill in the art would read and understand the term "about" as used in the patents-in-suit.  For at least these reasons, I disagree with Silvergate's proposed construction.   The term "about" should be defined exactly how the patentee defined it: "including the standard level of error for the device or method being employed."  I agree with Bionpharma's proposed definition of "about."

**D.     "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof"**

| Claim Term/Phrase for Construction | Silvergate's proposed construction | Bionpharma's proposed construction |
|---|---|---|
| "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof" | approximately 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof, wherein enalapril refers to enalapril base, its salt, or solvate or derivative or isomer or polymorph thereof | 13.86% to 14.14% (w/w) enalapril or a pharmaceutically acceptable salt thereof as determined by HPLC analysis, or any other scientifically acceptable method of equal or greater precision |

59.     The term "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof" appears in independent claim 1 of the '747 patent, and in independent claims 14 and 15 of the '366 patent.

60.     Enalapril is structurally depicted below:

61.     As discussed above, the patents-in-suit expressly define the term "about" to mean "including the standard level of error for the device or method being employed."  Inserting this express definition, "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof" means "14% (w/w), including the standard level of error for the device or method being employed, enalapril or a pharmaceutically acceptable salt thereof."

62.     The person of ordinary skill in the art would recognize that understanding the literal scope of this claim term requires the determination of acceptable devices or methods to employ in determining the weight percent of enalapril in a mixed powder.  The person of ordinary skill in the art would then be able to determine the standard level of error for those specific devices or methods, and therefore, understand the literal scope of the claim.

63.     The person of ordinary skill in the art would understand, based on the specification of the patents-in-suit, standard industry practice, and the literature, that high-performance liquid chromatography ("HPLC") analysis is one proper method to employ in determining the weight percent of enalapril in a mixed powder.

64.     It could well be stated that HPLC (or the closely related, "updated" method known as UPLC) is THE way to measure enalapril in a pharmaceutical formulation; it is a method of relatively high accuracy, and trying to achieve higher accuracy by switching to another method is not within the usual manner of acting or thinking.  Neither is switching to a method of lesser accuracy, because HPLC is so readily available, inexpensive, well-established, and straightforward.

65.     Indeed, HPLC is a common, dependable method a person of ordinary skill in the art would employ to determine the amount of a compound in a mixed sample.  HPLC is an

analytical technique that relies on pumps to pass a pressurized liquid solvent containing the mixed sample, with each component completely solubilized (dissolved) in the solvent, through a column filled with a solid adsorbent material.  As even small amounts of undissolved material can quickly foul an HPLC column, care is taken to filter liquids prior to injection.  Each component in the sample interacts slightly differently with the adsorbent material, causing different flow rates for the different components and leading to the separation of the components as the flow out of the column, allowing detection and potentially quantification of the components as the flow through a detector.  HPLC methods vary depending on the solvent, column size, column material, solvent gradient, flow, injection volume, and detector used. Nevertheless, the measured value in an HPLC assay generally does not depend on the details of the method, by virtue of the simple fact that a *calibration curve* is an essential need for using *any* HPLC method.

66.     The patents-in-suit describe HPLC testing to determine enalapril content.  D.I. 61, Ex. 1, '747 patent at col. 21, ll. 64-65 ("At various time points the powder in the bottle was analyzed for enalapril by HPLC/UV analysis"); *id.* at col. 28, ll. 41-42 ("At each given time point, enalapril and related substances were assayed via HPLC").  The patents-in-suit provide no other analytical methods to evaluate enalapril content in a mixed sample.

67.     The person of ordinary skill in the art would know that industry standards for evaluation of enalapril maleate content by HPLC required an accuracy of ± 1% or better of the quantity being measured, namely, the concentration of enalapril.  This is validated by the literature, which provides HPLC methods for determining enalapril content.

68.     E. Wyszomirska et al., *Identification and Determination of Antihypertonics from the Group of Angiotensin – Convertase Inhibitors by Densitometric Method in Comparition with*

*HPLC Method*, 67 Acta Poloniae Pharmaceutica 137 (2010) ("Wyszomirska") showed HPLC accuracy in enalapril determination better than ± 1%, whether in pure form or extracted from tablets:

Table 3. Statistical assessment of the results concerning the determination of the tested compounds in pharmaceutical substances.

| Tested compound | Method | Number of samples | Arithmetic mean of all measurements X [%] | Standard deviation S | Confidence brackets X ± ΔX PU = 95% [%] | RSD [%] |
|---|---|---|---|---|---|---|
| Lisinopril | Densitometric | 6 | 99.12 | 0.76 | 99.12 ± 0.79 | 0.76 |
| | HPLC | 6 | 101.45 | 1.11 | 101.45 ± 1.16 | 1.09 |
| Quinapril | Densitometric | 6 | 99.69 | 0.47 | 99.69 ± 0.50 | 0.47 |
| | HPLC | 6 | 101.67 | 1.02 | 101.67 ± 1.07 | 1.00 |
| Ramipril | Densitometric | 6 | 100.88 | 0.45 | 100.88 ± 0.47 | 0.44 |
| | HPLC | 6 | 100.80 | 0.17 | 100.88 ± 0.18 | 0.17 |
| Spirapril | Densitometric | 6 | 100.25 | 0.50 | 100.25 ± 0.53 | 0.50 |
| | HPLC | 6 | 100.03 | 0.23 | 100.03 ± 0.24 | 0.23 |
| Moexipril | Densitometric | 6 | 99.54 | 0.17 | 99.54 ± 0.18 | 0.17 |
| | HPLC | 6 | 100.10 | 0.18 | 100.10 ± 0.19 | 0.18 |
| Trandolapryl | Densitometric | 6 | 99.88 | 0.34 | 99.88 ± 0.36 | 0.34 |
| | HPLC | 6 | 99.32 | 0.33 | 99.32 ± 0.35 | 0.33 |
| Benazepril | Densitometric | 6 | 100.03 | 0.16 | 100.03 ± 0.17 | 0.16 |
| | HPLC | 6 | 98.73 | 0.48 | 99.73 ± 0.50 | 0.49 |
| Cilazapril | Densitometric | 6 | 99.99 | 0.40 | 99.99 ± 0.40 | 0.40 |
| | HPLC | 6 | 99.33 | 0.37 | 99.33 ± 0.37 | 0.37 |
| Fosinopril | Densitometric | 6 | 100.00 | 0.38 | 100.00 ± 0.38 | 0.38 |
| | HPLC | 6 | 100.08 | 0.40 | 100.08 ± 0.40 | 0.40 |
| Captopril | Densitometric | 7 | 98.92 | 1.15 | 98.92 ± 1.06 | 1.16 |
| | HPLC | 6 | 99.48 | 1.01 | 99.48 ± 1.06 | 1.01 |
| Enalapril | Densitometric | 6 | 99.15 | 1.07 | 99.15 ± 1.12 | 1.08 |
| | HPLC | 7 | 99.19 | 0.35 | 99.19 ± 0.32 | 0.35 |
| Imidapril | Densitometric | 6 | 99.37 | 0.39 | 99.37 ± 0.37 | 0.40 |
| | HPLC | 6 | 99.92 | 0.42 | 99.92 ± 0.40 | 0.43 |
| Zofenopril | Densitometric | 6 | 99.76 | 0.26 | 99.76 ± 0.25 | 0.26 |
| | HPLC | 6 | 99.47 | 0.31 | 99.47 ± 0.30 | 0.31 |

Table 4. Statistical assessment of the results concerning the determination of the tested compounds in pharmaceutical products.

| Tested compound | Method | Number of samples | Arithmetic mean of all measurements X [%] | Standard deviation S | Confidence brackets X ± ΔX PU = 95% [%] | RSD [%] |
|---|---|---|---|---|---|---|
| Lisinopril | Densitometric | 6 | 20.15 | 0.07 | 20.1 ± 0.07 | 0.34 |
| tablets 20 mg | HPLC | 6 | 19.73 | 0.27 | 19.73 ± 0.28 | 1.38 |
| Accupro 20 | Densitometric | 6 | 20.63 | 0.16 | 20.63 ± 0.17 | 0.78 |
| tablets 20 mg | HPLC | 6 | 20.03 | 0.22 | 20.03 ± 0.23 | 1.08 |
| Tritace 10 | Densitometric | 6 | 9.98 | 0.14 | 9.98 ± 0.15 | 1.44 |
| tablets 10 mg | HPLC | 6 | 10.02 | 0.02 | 10.02 ± 0.02 | 0.24 |
| Quadropril | Densitometric | 6 | 6.02 | 0.06 | 6.02 ± 0.06 | 1.02 |
| tablets 6 mg | HPLC | 6 | 6.22 | 0.08 | 6.22 ± 0.08 | 1.26 |
| Cardiotensin | Densitometric | 6 | 7.37 | 0.03 | 7.37 ± 0.03 | 0.41 |
| tablets 7.5 mg | HPLC | 6 | 7.57 | 0.08 | 7.57 ± 0.08 | 1.00 |
| Gopten | Densitometric | 6 | 2.08 | 0.02 | 2.08 ± 0.02 | 0.77 |
| capsules 2 mg | HPLC | 6 | 1.94 | 0.03 | 1.94 ± 0.03 | 1.40 |
| Lotensin | Densitometric | 6 | 10.03 | 0.06 | 10.03 ± 0.06 | 0.62 |
| tablets 10 mg | HPLC | 6 | 9.92 | 0.06 | 9.02 ± 0.12 | 0.61 |
| Inhibace | Densitometric | 6 | 1.05 | 0.01 | 1.05 ± 0.01 | 1.07 |
| tablets 1 mg | HPLC | 6 | 1.08 | 0.01 | 1.08 ± 0.01 | 1.02 |
| Monopril | Densitometric | 6 | 20.10 | 0.21 | 20.10 ± 0.21 | 1.05 |
| tablets 20 mg | HPLC | 6 | 19.77 | 0.24 | 19.77 ± 0.24 | 1.23 |
| Captopril | Densitometric | 7 | 12.71 | 0.13 | 12.71 ± 0.12 | 0.99 |
| tablets 12.5 mg | HPLC | 7 | 12.88 | 0.10 | 12.88 ± 0.09 | 0.75 |
| Enalapril | Densitometric | 7 | 19.96 | 0.18 | 19.96 ± 0.17 | 0.92 |
| tablets 20 mg | HPLC | 6 | 20.81 | 0.07 | 20.81 ± 0.08 | 0.35 |
| Tanatril | Densitometric | 6 | 19.44 | 0.20 | 19.44 ± 0.19 | 1.03 |
| tablets 20 mg | HPLC | 6 | 19.60 | 0.06 | 19.60 ± 0.06 | 0.33 |
| Zofenil | Densitometric | 6 | 29.95 | 0.17 | 29.95 ± 0.16 | 0.57 |
| tablets 30 mg | HPLC | 6 | 30.08 | 0.22 | 30.08 ± 0.21 | 0.72 |

Ex. F, Wyszomirska at 141-42.

69.    S. Naveed et al., *HPLC-UV Method for the Determination of Enalapril in Bulk, Pharmaceutical Formulations and Serum*, 3 J. ANAL. BIOANAL. TECHNIQUES 1 (2012) ("Naveed") showed HPLC accuracy in enalapril determination on the order of ± 1% (viz., recoveries between 99.8% and 100.75%):

| Systems | | LC 10 | | LC 20 | |
| Columns | Conc. (µgmL⁻¹) | Conc.Found (µgmL⁻¹) | Recovery (%) | Conc. Found (µgmL⁻¹) | Recovery (%) |
|---|---|---|---|---|---|
| Hypersil,ODS | 8 | 8.06 | 100.75 | 8.06 | 100.75 |
| | 10 | 9.89 | 98.9 | 9.98 | 99.8 |
| | 12 | 12.3 | 102.5 | 12 | 100 |
| Puropsher STAR | 8 | 7.99 | 99.875 | 8.03 | 100.375 |
| | 10 | 9.89 | 98.9 | 10.03 | 100.03 |
| | 12 | 12.03 | 100.25 | 12.05 | 100.41667 |

Table 3: Accuracy of enalapril.

Ex. G, Naveed at 3.

70.     M. Gumustas et al., *UPLC versus HPLC on Drug Analysis: Advantageous, Applications and Their Validation Parameters*, 76 CHROMOTAGRAPHIA 1365 (2013) ("Gumustas") demonstrated HPLC accuracy in measuring enalapril of approximately $\pm$ 0.2% and with precision of $\pm$ 0.168%:

**Table 1 continued**

| Compounds | Validation | | | | |
|---|---|---|---|---|---|
| | Linearity Range (µg/mL) | LOD (µg/mL) | LOQ (µg/mL) | Precision (RSD %) | Accuracy % |
| Voriconazole | 6.0–60.0 | 3.45 | 12.1 | 1.2 | 101.07 |
| Ritodrine | 1.0–100.0 | 0.55 | 0.69 | 0.19 | 100.47 |
| Isoxsuprine | | 1.65 | 2.1 | 0.26 | 100.81 |
| Sertraline | 425–700 | – | – | 0.63 | 98–102 |
| Imp-A | 0.24–4.70 | 0.002 | 0.0065 | 1.7 | 95–105 |
| Imp-B | 0.23–4.70 | 0.003 | 0.0102 | 1.81 | 95–105 |
| Imp-C | 0.22–4.70 | 0.0031 | 0.0102 | 1.52 | 95–105 |
| Omeprazole Sulfone Derivative | 5.0–100.0 | 0.4 | 1.3 | 1.2 | 99.9–100.6 |
| Duloxetine | 4.0–14.0 | 0.26 | 0.78 | 0.79–1.07 | 100.56 |
| Paracetamol | 100–600 | 0.01 | 0.03 | 1.02 | 99.81 |
| Diclofenac | 10–60 | 0.005 | 0.015 | 1.41 | 97.18 |
| Fosamprenavir | $4 \times 10^{-7}$–$1.6 \times 10^{-5}$M | $1.02 \times 10^{-7}$M | $3.09 \times 10^{-8}$M | 0.05 | 99.96 |
| Enalapril | 0.5–20 | 0.124 | 0.372 | 0.168 | 100.24 |
| Lercanidipine | 0.5–20 | 0.058 | 0.175 | 0.175 | 100.09 |
| Simvastatin | 1.0–50 | 0.25 | 1 | 1.1 | 89 |

Ex. H, Gumustas at 1396.

71.     Thus, a person of ordinary skill in the art, applying the definitions set forth in the patents-in-suit, their own knowledge, and industry standards, would understand that HPLC had an intrinsic error of $\pm$ 1% of the quantity being measured.  Applied to the quantity of enalapril

identified in the claims, 14% (w/w), this yields an error of ± 0.14% (w/w).  It is helpful in understanding this calculation to think of 14% (w/w) as meaning "The weight per 100 grams of formulation is <u>14 grams</u>".  The error, here 1%, means 1% of 14 grams, or 0.14 grams.

72.     The person of ordinary skill in the art would interpret "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof" as "13.86% to 14.14% (w/w) enalapril or a pharmaceutically acceptable salt thereof as determined by HPLC analysis, or any other scientifically acceptable method of equal or greater precision."

73.     For at least the above reasons, I agree with Bionpharma's proposed construction of the term "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof."

74.     I understand that Silvergate has proposed that the term "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof" be construed as "approximately 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof, wherein enalapril refers to enalapril base, its salt, or solvate or derivative or isomer or polymorph thereof."  I believe that this construction is flawed for at least two reasons.

75.     First, as discussed in detail above, the term "about" in the patents-in-suit carries a very specific meaning, namely, "including the standard level of error for the device or method being employed."  Silvergate's proposed construction entirely omits this critical definition, instead simply substituting the term "about" for "approximately."  Again, as discussed above, a person of ordinary skill in the art would not ignore the express definition of "about" as given in the patents-in-suit.  Furthermore, a person of ordinary skill in the art would not simply replace the term "about" with its equally vague synonym of "approximately," thus leaving the scope of the claims to be nebulous and open-ended.

76.     I understand that Silvergate has complained that the range as defined by

Bionpharma is "seemingly random" and "inconsistent" as compared to the other ranges defined by Bionpharma. This is not a valid criticism. The variation in ranges is entirely an artifact of the patentee's definition of "about," tying each quantity expressly to a method or device that a person of ordinary skill in the art would use to measure the quantity. A person of ordinary skill in the art would understand that determination of the literal scope of each claim term requires identification of such method or device, as any intrinsic errors will certainly vary across both ingredients, and the methods used.

77.    Silvergate finally argues that, due to the numerous types of HPLC available, there would be uncertainty in determining the level of error to apply to the claim terms, as each different method has different intrinsic errors. But a person of ordinary skill in the art would understand that there is a baseline accuracy requirement when performing chemical analyses; while more accurate methods may be known, any device or method that did not perform as well as methods well described in the literature would not be selected by a person of ordinary skill in the art. Furthermore, as illustrated by the consistent accuracies in published enalapril analyses, ordinary, garden-variety HPLC methods achieve ±1% accuracy across a wide range of equipment manufacturers/models, selections of mobile and stationary phases, and operators. Indeed, full pharmaceutical validation of an HPLC method includes requirements of proving robustness and ruggedness, which essentially quantify a consistent accuracy across devices and laboratories.

78.    Moreover, Bionpharma's proposed construction leaves open the option of using an equally or more precise method or device for measuring the quantity of enalapril in a mixed powder, which is certainly appropriate. While HPLC is the standard and common method for determining the quantity of a compound in a mixed sample, persons of ordinary skill in the art

would understand that they would be free to employ any other scientifically acceptable method that has equal precision or greater than that of HPLC to analyze the quantity of enalapril in a mixed powder.  The person of ordinary skill in the art would not sacrifice the precision and accuracy afforded by HPLC, a readily available and widely used analytical method, for another analytical method that has less precision, and would not understand the term "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof" to include a level of error greater than ± 1.0%.

79.     Silvergate's proposed construction thus improperly excludes the term "about" as used in the patents-in-suit.  Bionpharma's proposed construction applies this express definition exactly how a person of ordinary skill in the art would understand it to apply to the claim terms. The term "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof" should incorporate the patentee's express definition of "about," and should further be refined by selection of a standardized device or method to employ, such that a person of ordinary skill in the art would understand the true literal scope of the claimed amount of enalapril.  I agree with Bionpharma's proposed definition of "about 14% (w/w) enalapril or a pharmaceutically acceptable salt thereof" as "13.86% to 14.14% (w/w) enalapril or a pharmaceutically acceptable salt thereof as determined by HPLC analysis, or any other scientifically acceptable method of equal or greater precision."

### E.      "about 85% (w/w) mannitol"

| Claim Term/Phrase for Construction | Silvergate's proposed construction | Bionpharma's proposed construction |
| --- | --- | --- |
| "about 85% (w/w) mannitol" | approximately 85% (w/w) mannitol, wherein mannitol refers to mannitol or sugars that perform substantially the same function in substantially the same way to yield substantially the same result | 82.45% to 87.55% (w/w) mannitol as determined by HPLC analysis, or any other scientifically acceptable method of equal or greater precision |

80.    The term "about 85% (w/w) mannitol" appears in independent claim 1 of the '747 patent, and in independent claims 14 and 15 of the '366 patent.

81.    As discussed above, the patents-in-suit expressly define the term "about" to mean "including the standard level of error for the device or method being employed."  Inserting this express definition, "about 85% (w/w) mannitol" means "85% (w/w), including the standard level of error for the device or method being employed, mannitol."

82.    As is discussed above, the person of ordinary skill in the art would understand that defining this claim term requires the determination of acceptable devices or methods to employ in determining the weight percent of mannitol in a mixed powder.  The person of ordinary skill in the art would then be able to determine the standard level of error for those specific devices or methods to determine the literal scope of the claims.

83.    The person of ordinary skill in the art would understand, based on the specification of the patents-in-suit, standard industry practice, and the literature, that HPLC analysis is a proper method to employ in determining the weight percent of mannitol in a mixed powder.  As explained above, HPLC is a common method a person of ordinary skill in the art would employ to determine the amount of a compound in a mixed sample

84.    Scientific literature provides HPLC methods for determining mannitol content, and further provides standard levels of error associated with these methods.

85.    The U.S. Pharmacopeia method for determination of mannitol is based on HPLC:



Ex. I, USP/NF, *Mannitol* (Stage 6 Harmonization, Official August 1, 2015).

86.     The United States Pharmacopeia (USP), and the associated National Formulary (NF), are compilations of standards and standardized methods of determination for ingredients used in Pharmaceutical formulations, published jointly as the USP-NF, often referred to in abbreviated form as just USP.   In order to obtain the "USP" quality designation a given ingredient must conform to the USP-NF.   Responsibility for enforcement lies with the FDA, and in fact Federal law requires such conformance for all prescription medications (as with enalapril products), as well as for OTC products.   And while many pharmaceutical ingredients are routinely quantified using methods differing from the USP-NF, the USP-NF method is ultimately

definitive from a regulatory perspective and the methods are selected in part because of their ruggedness, that is, consistent accuracy when applied across laboratories.

87.     Specifically, the USP provides HPLC acceptance criteria of 97% to 102% of mannitol; that is, -3% / +2%.  A person of ordinary skill in the art would understand that this is tantamount to ± 3% accuracy.

88.     Thus, a person of ordinary skill in the art, applying the definitions set forth in the patents-in-suit, their own knowledge, and industry standards, would understand that, when used to measure mannitol in a mixed sample, HPLC had an intrinsic error of ± 3%.  Applied to the quantity of mannitol identified in the claims, 85% (w/w), this yields an error of ± 2.55% (w/w). It can be noted that the error is higher for the sugar alcohol mannitol than for enalapril because HPLC is more sensitive when analyzing amphiphilic or hydrophobic compounds such as enalapril as compared to hydrophilic compounds such as mannitol.

89.     The person of ordinary skill in the art would interpret "about 85% (w/w) mannitol" as "82.45% to 87.55% (w/w) mannitol as determined by HPLC analysis, or any other scientifically acceptable method of equal or greater precision."

90.     For at least the above reasons, I agree with Bionpharma's proposed construction of the term "about 85% (w/w) mannitol."

91.     Regarding Silvergate's proposed construction, first, as I detail at length above with respect to the "about 14% (w/w) enalapril" term, simply replacing the term "about" with "approximately" is incorrect and not how a person of ordinary skill in the art would understand "about 85% (w/w) mannitol" as used in the patents-in-suit.

92.     Second, as described in Section VII(B) of my Declaration, mannitol means one chemical and one chemical only; the second half of Silvergate's proposed claim construction is

necessarily incorrect in that it implicates that "mannitol" can literally be multiple chemicals.

93.     Third, Silvergate applies the exact same criticisms to Bionpharma's proposed construction of "about 85% (w/w) mannitol" as they do to "about 14% (w/w) enalapril."  For the reasons detailed above, those criticisms are without merit.

94.     Silvergate's proposed construction thus improperly excludes the term "about" as used in the patents-in-suit.  Bionpharma's proposed construction applies this express definition exactly how a person of ordinary skill in the art would understand it to apply to the claim terms. The term "about 85% (w/w) mannitol" should incorporate the patentee's express definition of "about," and should further be refined by selection of a standardized device or method to employ, such that a person of ordinary skill in the art would understand the true literal scope of the claimed amount of mannitol.  I agree with Bionpharma's proposed definition of "about 85% (w/w) mannitol" as "82.45% to 87.55% (w/w) mannitol as determined by HPLC analysis, or any other scientifically acceptable method of equal or greater precision."

**F.     "about 1% (w/w) colloidal silicon dioxide"**

| Claim Term/Phrase for Construction | Silvergate's proposed construction | Bionpharma's proposed construction |
|---|---|---|
| "about 1% (w/w) colloidal silicon dioxide" | approximately 1% (w/w) colloidal silicon dioxide | 0.95% to 1.05% (w/w) colloidal silicon dioxide as determined by gravimetric analysis, or any other scientifically acceptable method of equal or greater precision |

95.     The term "about 1% (w/w) colloidal silicon dioxide" appears in independent claim 1 of the '747 patent, and in independent claims 14 and 15 of the '366 patent.

96.     As discussed above, the patents-in-suit expressly define the term "about" to mean "including the standard level of error for the device or method being employed."  Inserting this express definition, "about 1% (w/w) colloidal silicon dioxide" means "1% (w/w), including the

standard level of error for the device or method being employed, colloidal silicon dioxide."

97.     As is discussed above, the person of ordinary skill in the art would understand that defining this claim term requires the determination of acceptable methods to employ in determining the weight percent of colloidal silicon dioxide in a mixed powder.  The person of ordinary skill in the art would then be able to determine the standard level of error for those specific devices or methods to determine the literal scope of the claims.

98.     The person of ordinary skill in the art would understand, based on standard industry practice and the literature, that gravimetric analysis is a common and proper method to determine the weight percent of colloidal silicon dioxide in a mixed powder.

99.     Scales used to weigh out chemical compounds during formulation are very accurate, typically being housed in laminar airflow (LAF) rooms with controlled humidity that are vacuumed and dry-wiped before each use.  Weighings of a metric ton or more are not uncommon with both oral formulations and large-volume parenterals (LVPs).  One skilled in the art will recognize that in general, high accuracy is only truly difficult when tiny quantities (a few milligrams or less) must be weighed, so that accuracies of weighing steps during manufacture are generally very good, much better than +-1%; superpotent drugs such as Category III and IV that require more exotic conditions and equipment are not a concern in the present case, as enalapril is not such a drug.  A significant advantage of gravimetric measurement is that standard weights used for calibrating balances which are readily available in a very wide range capacities, and do not change significantly over time and use.

100.     The patents-in-suit provide no methods or examples for quantitating colloidal silicon dioxide content in a mixed powder formulation.  However, I as discuss above, the term "about" inherently leaves the question of the "device or method employed" open. A person of

ordinary skill in the art would understand that, in the absence of intrinsic evidence as to preferred methods for measuring silicon dioxide content, the literature would detail effective methods for measuring silicon dioxide in a mixed powder sample.

101.    It is not possible, without using exotic conditions such as hydrofluoric acid digestion, to use HPLC to analyze for colloidal silicon dioxide.  This is because CSD cannot be dissolved in any solvent suitable for HPLC.  HPLC is a method that relies on solubility of the analyte in a solvent mixture, this solvent mixture being referred to as the "mobile phase". Indeed, the solubility of silica is so negligible in HPLC solvents that silica is the basis of the vast majority of "stationary phases", powders that fill the column through which the solvent mix (mobile phase) flows.  It is crucial that the stationary phase NOT dissolve, not even slowly over weeks, in the mobile phase.  Hence the reason silica can be used at all in stationary phases—and it is used in nearly all—is because it does not dissolve in ordinary HPLC solvent mixtures.  This insolubility precludes it from being analyzable with HPLC.

102.    In contrast, simple weight-based methods known as gravimetric methods are well established for colloidal silicon dioxide.  Such a method can actually take advantage of the insolubility of CSD in all but the most aggressive alkali, by basically chemical extraction of everything else besides the highly resistant CSD, and then simply weighing what remains, which is silica.

103.    Scientific literature provides gravimetric methods for determining colloidal silicon dioxide content, and further provides standard levels of error associated with these methods.

104.    Gravimetric analysis of colloidal silicon dioxide is described in the literature:

## 4500-Si C.   Gravimetric Method

### 1. General Discussion

*a. Principle:* Hydrochloric acid decomposes silicates and dissolved silica, forming silicic acids that are precipitated as partially dehydrated silica during evaporation and baking. Ignition completes dehydration of the silica, which is weighed and then volatilized as silicon tetrafluoride, leaving any impurities behind as nonvolatile residue. The residue is weighed and silica is determined as loss on volatilization. Perchloric acid ($HClO_4$) may be used to dehydrate the silica instead of HCl. A single fuming with $HClO_4$ will recover more silica than one with HCl, although for complete silica recovery two dehydrations with either acid are

necessary. The use of $HClO_4$ lessens the tendency to spatter, yields a silica precipitate that is easier to filter, and shortens the time required for the determination.

*b. Interference:* Because glassware may contribute silica, avoid its use as much as possible. Use reagents and distilled or deionized water low in silica. Carry out a blank determination to correct for silica introduced by the reagents and apparatus.

### 2. Apparatus

*a. Platinum crucibles,* with covers.

*b. Platinum evaporating dishes,* 200-mL. In dehydration steps,

acid-leached glazed porcelain evaporating dishes free from etching may be substituted for platinum, but for greatest accuracy, platinum is preferred.

### 3. Reagents

For maximum accuracy, set aside batches of chemicals low in silica for this method. Store all reagents in plastic containers and run blanks.

*a. Hydrochloric acid,* HCl, 1 + 1 and 1 + 50.

*b. Sulfuric acid,* $H_2SO_4$, 1 + 1.

*c. Hydrofluoric acid,* HF, 48%.

*d. Perchloric acid,* $HClO_4$, 72%.

### 4. Procedure

Before determining silica, test $H_2SO_4$ and HF for interfering nonvolatile matter by carrying out the procedure of ¶ 4a5) below. Use a clean empty platinum crucible. If any increase in weight is observed, make a correction in the silica determinations.

*a. HCl dehydration:*

1) Sample evaporation—To a clear sample containing at least 10 mg silica, add 5 mL 1 + 1 HCl. Evaporate to dryness in a 200-mL platinum or acid-leached glazed porcelain evaporating dish, in several portions if necessary, on a water bath or suspended on an asbestos ring over a hot plate. Protect against contamination by atmospheric dust. During evaporation, add a total of 15 mL 1 + 1 HCl in several portions. Dry dish and place it in a 110°C oven or over a hot plate to bake for 30 min.

2) First filtration—Add 5 mL 1 + 1 HCl, warm, and add 50 mL hot distilled water. While mixture is hot, filter through an ashless medium-texture filter paper, decanting as much liquid as possible. Wash dish and residue with hot 1 + 50 HCl and then with a minimum volume of distilled water until washings are chloride-free. Save all washings. Set aside filter paper with its residue.

3) Second filtration—Evaporate filtrate and washings from the above operation to dryness in the original platinum dish. Bake residue in a 110°C oven or over a hot plate for 30 min. Repeat steps in ¶ 2) above. Use a separate filter paper and a rubber policeman to aid in transferring residue from dish to filter. Take special care with porcelain dishes because silica adheres to the dish.

4) Ignition—Transfer the two filter papers (one if dehydrated by 4b) and residues to a covered platinum crucible, dry at 110°C, and ignite at 1200°C to constant weight. Avoid mechanical loss of residue when first charring and burning off the paper by gradual heating at minimum temperature. Too rapid heating may

form black silicon carbide. Cool in desiccator, weigh, and repeat ignition and weighing until constant weight is attained. Record weight of crucible and contents.

5) Volatilization with HF—Thoroughly moisten weighed residue with distilled water. Add 4 drops 1 + 1 $H_2SO_4$, followed by 10 mL HF, measuring the latter in a plastic graduated cylinder or pouring an estimated 10 mL directly from the reagent bottle. Slowly evaporate to dryness over an air bath or hot plate in a hood and avoid loss by splattering. Ignite crucible to constant weight at 1200°C. Record weight of crucible and contents.

*b. $HClO_4$ dehydration:* Follow procedure in ¶ 4a1) above until all but 50 mL of sample has been evaporated. Add 5 mL $HClO_4$, and evaporate until dense white fumes appear. (CAUTION: *Explosive—Place a shield between analyst and fuming dish.*)

Continue dehydration for 10 min. Cool, add 5 mL 1 + 1 HCl and 50 mL hot distilled water. Bring to a boil and filter through an ashless quantitative filter paper. Wash thoroughly ten times with hot distilled water and proceed as directed in ¶s 4a4) and 5) preceding. For many purposes, the silica precipitate often is sufficiently pure for the purpose intended and may be weighed directly, omitting HF volatilization. Make an initial check against the longer procedure, however, to be sure that the result is within the limits of accuracy required.

### 5. Calculation

Subtract weight of crucible and contents after HF treatment from the corresponding weight before HF treatment. The difference, *A*, in milligrams is "loss on volatilization" and represents silica:

$$mg\ SiO_2/L = \frac{A \times 1000}{mL\ sample}$$

### 6. Precision and Bias

The accuracy is limited both by the finite solubility of silica in water under the conditions of analysis and by the analytical balance sensitivity. Under optimum conditions, an experienced analyst can obtain a precision of approximately ±0.2 mg $SiO_2$.

### 7. Bibliography

HILLEBRAND, W.F. et al. 1953. Applied Inorganic Analysis, 2nd ed. John Wiley & Sons, New York, N.Y. Chapter 43.

KOLTHOFF, I.M., E.J. MEEHAN, E. B. SANDELL & S. BRUCKENSTEIN. 1969. Quantitative Chemical Analysis, 4th ed. Macmillan Co., New York, N.Y.

Ex. J, *4500-Si Silica, in* STANDARD METHODS FOR THE EXAMINATION OF WATER AND WASTEWATER, at 4- 118-19 (A.E. Greenberg et al. eds., 18th ed. 1992).

105.    Specifically, the above-described method begins with "at least 10 mg silica" and states that a precision of ± 0.2mg SiO2 is attainable, thus, the precision of this method is ±2%. Because the method can be calibrated with accurately-weighted silica standards, an overall accuracy of ±5% can be achieved.

106.    Thus, a person of ordinary skill in the art, applying the definitions set forth in the patents-in-suit, their own knowledge, and industry standards, would understand that gravimetric analysis had an intrinsic error of ± 5% when used to measure colloidal silicon dioxide in a mixed sample.  Applied to the quantity of colloidal silicon dioxide identified in the claims, 1% (w/w), this yields an error of ± 0.05% (w/w).

107.    The person of ordinary skill in the art would interpret "about 1% (w/w) colloidal silicon dioxide" as "0.95% to 1.05% (w/w) colloidal silicon dioxide as determined by gravimetric analysis, or any other scientifically acceptable method of equal or greater precision."

108.    For at least the above reasons, I agree with Bionpharma's proposed construction of the term "about 1% (w/w) colloidal silicon dioxide."

109.    Regarding Silvergate's proposed construction, first, as I detail at length above with respect to the "about 14% (w/w) enalapril" term, simply replacing the term "about" with "approximately" is incorrect, and yields incorrect results.

110.    Silvergate applies the exact same criticisms to Bionpharma's proposed construction of "about 1% (w/w) colloidal silicon dioxide" as they do to "about 14% (w/w) enalapril."  For the reasons detailed above, those criticisms are incorrect.

111.    Silvergate's proposed construction thus improperly excludes the term "about" as

used in the patents-in-suit.  Bionpharma's proposed construction applies this express definition exactly how a person of ordinary skill in the art would understand it to apply to the claim terms. The term "about 1% (w/w) colloidal silicon dioxide" should incorporate the patentee's express definition of "about," and should further be refined by selection of a standardized device or method to employ, such that a person of ordinary skill in the art would understand the true literal scope of the claimed amount of colloidal silicon dioxide.  I agree with Bionpharma's proposed definition of "about 1% (w/w) colloidal silicon dioxide" as "0.95% to 1.05% (w/w) colloidal silicon dioxide as determined by gravimetric analysis, or any other scientifically acceptable method of equal or greater precision."

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully submitted,

Date: November 22, 2017

David Anderson, Ph.D.

39